All right, next case of the morning is number 26-1199, Parks v. Dean. I want to hear from Mr. Dare whenever you're ready. Your Honor, it's Jason Dare here on behalf of the appellants Christopher Dean, Dustin Wanford and Simon Stubblefield. We're here today on an interlocutory appeal in which these three deputies were denied qualified immunity as to three separate claims of excessive force. These are, one, that Dustin Wanford pushed Ms. Parks from behind in a standing position while she was handcuffed, two, that Simon Stubblefield hogtied or hobbled Ms. Parks, and three, that the three appellants, Christopher Dean, Dustin Wanford, and Simon Stubblefield moved Ms. Parks from the middle of Highway 49 to the side of the road. At what point did she say that her nose was broken? Ms. Parks claims that her nose was broken when she was pushed from behind. She was handcuffed from behind and she claims that she tripped forward and being not able to catch herself, she landed face first into the pavement. And the EMTs didn't say her nose was broken, right? That is correct. So is there evidence about that at this point? There is not summary judgment evidence. The medical records from the University of Mississippi Medical Center are not part of the summary judgment evidence. There have been medical records that have been obtained and were disclosed during discovery, but they are not before this court. Okay. I heard you say, I thought, that as she was being pushed, she tripped and fell down. Is it your position she was pushed forward or that something else happened and she tripped or stumbled? I didn't quite understand what you said. And that was the distinction that I think that Judge Jordan was trying to make in that in some instances he uses the word slam, in some instances he uses the word push. What she claims is that when she was standing up, she was handcuffed from behind and that she was pushed forward and that she was unable to break her fall and landed face first into the pavement. And that's why I don't believe the action at issue is Dustin Wadford taking her to the ground face forward. It was merely a push from behind in which she claims in her deposition that she stumbled forward. Is she standing still at that point or is she moving, walking, or in motion? She doesn't say in her deposition. In fact, once you get to that point in her deposition, she was a bit vague. We do know everything that occurred up until that point. Of course, the officers allege that she never got up and she was never standing. Dustin Wadford specifically says, look, I never pushed her forward. It seems undisputed that she's very combative throughout all of this due to whatever state of mind she was in. She's very combative throughout the entire encounter. At some point, does she submit to an arrest and become cooperative or maybe I should say less combative instead of cooperative, but she's compliant. And that's one of the issues in this case is that, of course, the officers claim she never became cooperative. In fact, even the EMTs have in the record before this court that she wasn't being cooperative. She claims that once she stood up, she was, quote, unquote, cooperative. That was never made known to the officers. There were no statements similar to the Pratt v. Harris County case where the arrestee stated, I give up, I'm not going to fight anymore. There were no verbalizations that she was going to be compliant at that time. And what the officers had faced prior to her being handcuffed or being kicked in the groin, bitten, spit at. And so if she was on her feet upon being handcuffed, and we go from one second kicking and biting and scratching and doing everything that she was doing to literally the next second when she gets handcuffed, is the court then supposed to presume that she is? Well, as you are probably well aware, we do have cases like Bush v. Strain that try to parse and slice and dice these encounters. And of course, if your fellows had had body cams, we wouldn't be here if what you're saying is accurate, which is very unusual evidence. But she was hogtied after she was allegedly pushed down, right? Correct. So that's quite inconsistent with saying that she was compliant at that point. That is correct. And one of the big issues with the hogtying claim is that there is absolutely no injury whatsoever as a result of being hogtied. Even using the Alexander v. Round Rock, v. City of Round Rock, some injury where this court has held that a psychological injury or perhaps some type of bruising may suffice. There is no injury whatsoever as a result of being hogtied. Now, when you're saying there's no injury whatsoever, she doesn't allege any, is that what you're saying? She doesn't allege one, and the facts show that there wasn't one. Okay. I have provided the EMT records that immediately follow her being hogtied, in which her O2 stats were 100% on room air. She didn't have any problems with her blood pressure. She had no signs or symptoms of any of that. Well, let's go back to the pushing down. We're here with an uncertain set of facts. You don't want to dispute material facts if we've determined that they are material. But I do think there's a genuine dispute. Isn't the essence of her claim, regardless of what you're saying one second to the next second. I'm not sure how undisputed it is, how quickly some of this occurred. But she's handcuffed in a standing position, hands behind her back. And I think this is a quote, but maybe it's from a brief. He slammed her face first into the concrete from a standing position. And it seems to me you're suggesting that might not be excessive force based on her lack of compliance. She hadn't said any magic words yet or whatever else. But it does seem to me that there's an uncertainty about what was occurring at that stage. And whether somebody who was just standing being pushed, who obviously can't break or fall because her hands have been handcuffed, being pushed face first. If it's, my understanding is she was handcuffed while still on the highway. Correct. And so this is asphalt below, not something soft she's about to smash her face into. Isn't that a fact question that Judge Jordan was correct in holding off judgment on? I don't believe so, Your Honor. And I make the distinction with Bush v. Strain in this case. In Bush v. Strain, for instance, the lady who was pushed from behind into a police vehicle, all she had been alleged of doing was throwing a cup of water in another witness's face. There was, I believe, some- Let me back you up, not back you up, stop you there. So if that woman in Bush v. Strain had been more belligerent, she could have had her face smashed into the windshield. I don't believe that is the case, but you have to look at the totality of the facts that are then available and knowable to a reasonable law enforcement officer. We're talking about Heck v. Humphrey, so the question isn't just that all excessive force is actionable. It is whether, in light of the fact that she pled guilty to an assault on a police officer, can you splice and dice the situation between when she was belligerent and assaultive and when she became non-assaultive? Which is, the latter situation is the way the panel saw it in Bush, and the question is whether there's enough here on the plaintiff's side to raise a reasonable issue as to whether she ever became non-assaultive. But I agree, and- I'll bet you do. You're against splicing and dicing, I take it? No, I'm not. I am for taking a look at all of the facts that were then knowable to the law enforcement officers. I would say that, yes, pushing somebody from behind after they've done nothing more than pulling away and throwing a cup of water in somebody's face, as in Bush v. Strain, would not warrant being slammed into the side of a police vehicle. However, the officers in this case were called to the scene because Ms. Parks was, according to the 911 record, was running in the middle of Highway 49. They were notified that the Bentonia police officer, Cole McGinnis, was in a fight for his life. That he was, they received three calls, get here quick, get here quick, this officer isn't doing good, he needs backup. Well, is he particularly small and she's particularly large or what? I mean, I know people that are supposedly high can be very strong, but this- I would say, honestly, just the opposite. He is, Cole McGinnis, from sitting in his deposition, was six foot six one. Says here she's 98 pounds, is that, did I read that right? Correct. She was maybe five two. You're saying she doesn't pack a powerful punch, but 98 pounds is pretty slight. And what the officers said in this case is that she had more strength than they have ever seen in their entire life. They were suspecting afterwards that it could have been, they had no idea if she was on anything, but if she was, how she had that much strength to her. They heard her when she was pulling away from the officers, that it almost sounded like her bones were breaking or she was pulling her shoulder out of place. So when the officers arrived and she had her legs wrapped around Cole McGinnis, they immediately went in to help a fellow officer and the immediate response was she sits up and tries to bite Officer McGinnis in the groin. Some witness, right? There is. He was not deposed and he is the one that called in. And so the witness does not have testimony in front of this court and there is no summary judgment. Let me ask you about the indictment. She was indicted on three counts and the officers were named. Which officers were those? It was McGinnis, Dean and Watford. Okay, and also McGinnis has been dismissed. Is that right? That is correct. So was that settled or was it dismissed just dismissed? I will have to allow counsel opposite to answer that. I know the answer, but I'm not certain what the pleadings say and I'm not sure if there's any confidentiality in anything. If that sort of in a roundabout way answers the question. Okay. Your Honor is based on the totality of what was known. We're seeking a for this court to reverse and render an opinion in favor of these three defendants. I will follow up with anything else. Opportunity for rebuttal. Thank you, Mr. Guy. Thank you. On behalf of Mrs. Parks, may it please the court. Your Honor, this is a case really that's honestly very simple. It's a fact pattern that has two very differing stories in this matter. And as it's already been pointed out, Ms. Parks did not simply trip. As a matter of fact, the defendants in this case, they have testimony that she was never stood up from the ground. Their testimony was in this case that Ms. Parks remained on the ground the entire time after she went down with Officer Cole McGinnis. When she went down with McGinnis, were they in the middle of the road? They were, Your Honor. They were not in the middle of Highway 49, but just to the side of it, kind of on the shoulder of it. On the shoulder? Yes, ma'am. Was this a four-lane divided 49 there? It was. In between, just north of Ventonia and about 10 minutes south of Yazoo City. They were on the surface of 49, whatever direction that was. Maybe the center, maybe off the center, and then ultimately dragged off that highway. Right. Where the actual accident happened, there was a concrete median, if you will, on a merge in between the merge lane and the entrance lane into a road that came off of Highway 49 going into Ventonia. There was a triangular, flat concrete pad, which is where the incident initially occurred. I think there's some evidence in front of Judge Jordan that she was constantly, continuously on the pavement, not on her feet. How does this push down under their view occur? Right. Here's where the factual divergent occurs. After Cole McGinnis calls in for help and the two deputies, Dean and Wadford, arrive to give him assistance, they push him off to the side and he's laying on the ground catching his breath. That's when the struggle occurs while she's on the ground. According to the testimony from, and Ms. Parks corroborates this, according to the testimony from the officers, there's a struggle and she's handcuffed while on the ground. She was handcuffed in front to begin with, was she not? No, Your Honor. She was handcuffed from behind. Okay. She was put in a maximally prone position and she was handcuffed from behind while on the ground. Parks does not dispute that she was on the ground when that happens. The deputies say that from that point, they then hog tied her because she was struggling. And what Ms. Parks states is that before she was put into hog ties, that she was stood up while handcuffed and that she began to be compliant. And that's what the district court found to be the factual divergence in this case. Because what Ms. Parks claims is, is that in response to the earlier assault, that Deputy Wadford was mad and that he was essentially giving her some police justice and he slams her into the ground face first while she's handcuffed. And it not just broke her nose, it broke her entire orbital eye socket. And, and so at that point, restraints were put on her legs because she was squirming around and, and she was- So she gets even, so having had her nose smushed, she gets even more combative? She, she admits that she was yelling and saying, you know, why are you doing this to me? You're hurting me. You've broken my face. And of course, they don't seem to care. And one of the problems here, and Judge Jones has alluded to it, is to separate what she's been convicted for. And as long as that conviction is there, it can't be dealt with civilly. And what she's claiming in this lawsuit. And, and it's, it's one thing to say that her assault on the three officers were done with, and here we're now dealing with what happened thereafter. But what I'm hearing from you is that the real understanding of this, depending on whose story you listen to, but maybe both stories, your, your client's story, is that it was at times she was assaulting them, then they assaulted her, and then she assaulted them back. Is that a fair characterization of how you're describing the events? Well, I'm not describing them. I mean, as she- You are summarizing what's here. Excuse me. You weren't there, as far as I know. As Ms. Park states, there was, she agrees that there was a struggle with Cole McGinnis, because she doesn't, didn't understand why he was attempting to put her into custody. And she kept saying, she was asking for assistance. Okay, but all three, as you, or maybe your friend on the other side said, all three are by Ms. Park, right? Stubblefield was not named in the initial indictment. Okay, but at least Wadford was named as someone that she assaulted. Wadford, as well as Dane, as well as McGinnis. And any assault against Wadford would have had to occur, it seems to me, after he gets involved. And maybe after the time that she says he was pushed down on the asphalt, because she was responding to that. No, Your Honor. She was initially on the ground before Parks and Dane- When did he assault, when could she have assaulted Wadford? And you're, how would that fit with her story? Right, before she was handcuffed. Wadford? All right, let me back up just a little, if I may. She is there on the ground, struggling with Officer Cole McGinnis from the Bentonnia Police Department. And this is before Dane and Wadford arrive on the scene. She is not handcuffed. She's on the ground, on her back, and he is straddling her midsection. And she's got her legs around him. Yes, she doesn't remember that, but that's what he said. Well, she has a real interesting memory. Well, she doesn't dispute that she had, you know, she had taken drugs earlier in the day. And it is clear in the record that she was highly intoxicated. And so, but she's on the ground and they arrive, and according to deposition testimony from Deputy Dean, he pushed Cole McGinnis aside. He punched her in the face. He said that he did not injure her and that she was not bleeding and had no injuries from the punch to the jaw. And at that point, there was a struggle. They claimed that she was resisting arrest and, you know, not allowing them to handcuff her. But they claimed that they rolled her over, both Wadford and Dane, and they handcuffed her and she was face down on the ground. And that any of the assaults that she was indicted for, that occurred before she was handcuffed. Well, but you also seem to be saying, which started us on this trail, and I'm glad you have now made sure we have a little bit bigger context, but it seems to me that what you're saying is that after whatever happened, and she says she was pushed down from a standing position, she again was struggling with Wadford and the other officer, too, perhaps. Perhaps committing assaults. There was no assault alleged after she was handcuffed. OK, we'll just have to be sure, but I'm sure you know the record. Is that in the indictment or what? The indictment was for the actions that occurred before she was handcuffed. But, I mean, does the indictment say that in words or does it just say she did then and there at such a location assault the police officer? It talks about her biting and kicking the officer. Well, McGinnis. And during that deposition, and during their depositions, they acknowledge and report all the actions that they claim that she assaulted them occurred before she was handcuffed. But is there anything in the charging document to which she pled guilty that places this on a timeline vis-a-vis her being handcuffed? Or is it just that she pled guilty to assaulting three officers on a certain evening? To answer your question, I think it's interesting and very noteworthy that the charging indictment was very, I mean, it was devoid of really anything. As a matter of fact, her guilty plea was... The answer is no, there's nothing in the indictment that would place this before or after the handcuff. There's no way for us to know that except for discovery in this case. Is that correct? The discovery in this case is what confirms that, Your Honor. And so what's important to note is that when she pleads guilty to only one count, it's not identified who she's pleading guilty to. But the bottom line is just like in the Bush case, it is very factually distinct based on the facts that we know in this record that the assault actions occurred prior to being handcuffed. And that once she was handcuffed, that's when the 1983 charges are then alleged, just like in the Bush case. And so... So you dismissed McInnes without paying him anything? No, we settled with Officer McInnes and the town of Bentonia, Your Honor. And what... The town of Bentonia and Officer McInnes, we settled with them. There was a confidential settlement with them. We didn't just dismiss them. Well, let me just... I mean, my personal opinion, you may well get to trial on this case, but I don't think a jury is going to be real sympathetic to your client. And they may not, Your Honor. And I recognize that in every 1983 case, you have a criminal defendant and you have the law enforcement. And every 1983 plaintiff in America probably walks into the courtroom with an air of prejudice against them because they're a criminal. But the bottom line is, is that the 1983 law in the Constitution of the United States is there to protect those individuals when officers overstep their constitutional provisions of how they're supposed to treat an individual in their custody. And in this particular case, it doesn't matter how bad Ms. Parks is as a person. I mean, the officers, according to her, after she was handcuffed and compliant, they were equally as bad. They committed a crime of assault and one that could have had deadly consequences, according to our police expert. I mean, she was slammed from a standing position and it broke her orbital eye socket. She also had a deflated lung, I mean, and is the medical record from UMC. Well, how come, really? I mean, the EMT report looks amazingly normal. The EMT report represented about 10 minutes of care from the time it took for them. Well, I know that. But blood pressure is blood pressure. Heart rate is heart rate. Breathing rate is breathing rate. And, you know, unless that was a fake, it looks amazingly normal. Your Honor, all I can say is that it's undisputed that she had significant injuries from as reported by the UMC medical records from her four days that she was in the hospital after she arrived at the University of Mississippi Medical Center. She had a deflated lung. She had a broken orbital eye socket. She's had two corrective surgeries to her face as a result of this. So there are significant injuries from the entire incident that occurred after being handcuffed and compliant, according to her testimony. Let me ask you about the hog tying. Different officer involved with that, correct? Watford is the only one responsible in your case for the pushing down and not for the hog tying? Get that out of the way first. Is that correct? Watford's not involved in the hog tying claim? According to all of the testimony that occurred in this case, Officer Deputy Stubblefield was the sole person responsible for grabbing the hog ties and placing the hog ties on her. So is your claim really about the hog tying itself, which seems to be a little bit steeper hill to climb, or what happened to her after she was hog tied? Well, and I'm glad you brought this up because it was something, it was a point that I hopefully wanted to get to. The counsel opposite claims that there was no injuries whatsoever to her as a result of being hog tied. Well, she was hog tied and left in a position for approximately 15 minutes, according to the records in this case. And during that time, most importantly, if you listen to the police, the deputy's version of the events, she sat there in a hog tied position, face down on the ground, and just repeatedly smashed her face while hog tied, and being held down by the officers, broke her orbital eye socket and her nose just repeatedly smashing her face while hog tied. Now, Yazoo County's internal policies and procedures require, consistent with Gutierrez and other cases that talk about hog tying and maximally prone position when someone's highly intoxicated, is you get them up. You don't leave them maximally prone. You don't put them in that position. And of course, they didn't do that. They left her down there and they had their hand on her in that maximally prone position. We have a five minute video, which was filmed by a constable. It was the only footage that we had, and it was after she was injured. It was after she was hog tied, and they're holding her face down in the gravel. And of course, what happens at that point is, how is she allowed to repeatedly break her face while she's in this maximally prone position? So the statement that she wasn't injured as a result of being hog tied is just simply devoid of any facts in this case. You're not taking the position that hog tying is per se unconstitutional, right? Taking the position that has already been defined by this court. Well, those cases, I mean, he does have a point, the other counsel, that when we have used hog tying, it's the same as . . . What she's alleging is no different than the guy who says the handcuffs were too tight. In other words, suppose he suffers injury to his wrist because the cuffs are too tight. That's what she's saying about hog tying. The hog tying cases that I'm familiar with are those where the person couldn't breathe and it expired because of deprivation of oxygen. That's a completely different situation. Regardless of whether it's a deprivation of oxygen or whether it's allowing her to smash her face in the ground, the bottom line is that she is highly intoxicated, and that was admitted and found by the Deputy Chief of Police, Terry Gann. Well, if you do anything to anyone who's . . . We've had another case where the person was in the police vehicle, highly intoxicated, and he keeps banging his head against the window. I mean, there's certain things you can't really control. What were they supposed to do, cradle her in their arms? Well, I'm glad you asked that. There's a photo that the defendants admitted as a part of their exhibits. It was ROA 543. Well, I appreciate this because none of this was in your briefs. And Ms. Parks is on her side strapped to a gurney, and she was not in a position that prevented her or that allowed her to smash her face. Why, when the EMTs get there, is she laid on her side? But when the officers are there, in the 15 minutes before the EMTs get there, is she forced to lay down? Now, bear in mind, the medical records bear out that she had a punctured lung, and in the video, she's claiming, I can't breathe. I mean, she's saying, I can't breathe. So the fact . . . So she's sitting there in the ground, suffering and struggling, and I don't think the standard is under Gutierrez, well, if you die, then we have a claim, and that hog tying is not permissible in that situation if you die, or like the case that happened in South Haven, where the individual died. The bottom line is that the action wasn't proper, and they knew it, and it was inconsistent with their own policies and procedures that say, if someone's highly intoxicated, get them up off the ground. Don't keep them face down on the ground. You know, I mean, this is all very interesting. I read Judge Sheridan's opinion. I read the briefs. I didn't see anything about a punctured lung, I can't breathe, five minute video. I mean, they're not alluded to, including by Judge Sheridan. So all of this is news to me. That, her medical injuries are undisputed, and were not, that wasn't in dispute. So there was really no reason to submit that as a condition of, I mean, as a part of the briefing to the lower court in regards to that. The video- In the record anywhere? But even Judge Sheridan didn't refer to serious injuries of that nature. I mean, it was, it's been alleged that she had serious injuries. It's not been disputed that she had serious injuries. The question is, is who caused it? According to them, she caused it. According to us, they caused it. I mean, which is what Judge Sheridan found, that there was a factual dispute. And that that's why, you know, QI, I mean, you know, was denied. And, you know, I know that my time is just about up, which goes into the last point that I want to make. We believe that this court doesn't have jurisdiction to resolve this issue at this point, because there is a factual issue. This doesn't turn on a question of law. This turns solely on a question of fact. The entire argument today between us and counsel opposite has been about the facts in this case. These are the facts that a jury is supposed to determine. With all due respect and deference to the bench here, this isn't for us to determine. This is for the jury of the peers in the state of Mississippi to make that factual determination. And to decide whether or not she's telling the truth and to decide whether or not they're telling the truth, exactly how she received those injuries. But there's this insuperable problem about the nature of the charge and the nature of the encounter. And I'm just, I'm not sure how that's going to come out. But that is a problem in your analysis of the case. She was not just some bystander who got picked up, as the lady did in Bush v. Strain, from the nature of the encounter here. I'm just posing that as a situation that is a little different here. If I may just briefly respond. Sure. Your Honor, I appreciate your concern in that regard. However, I would say those are questions that go to the weight of the evidence that the jury is supposed to make that determination. Well, if that's so, then Heck v. Humphrey is almost a dead letter. I respectfully disagree, Your Honor, because Heck doesn't apply in this situation. Because once the factual divergence occurs in this case, Heck is over. And Heck says, as a matter of fact, Judge Jordan said specifically, if there is any allegation that any of the 1983 actions that she is alleging occurred prior to being handcuffed, those claims are dismissed and barred. And we don't dispute that. What we're saying is that— That's why I asked if you dismissed McGinnis. Well, no, we didn't. We settled with him. And that was before any briefing. And so the bottom line is, is that under Heck, all of that takes care of everything before she's handcuffed. But after she's handcuffed, and according to her own testimony, she's compliant, that changes the game and the narrative. All right. My time is up. All right. Thank you. Thank you, Your Honor. All right. Mr. Dare. Your Honors, I'd like to begin with the hog tying and the claim of a lack of jurisdiction. It is uncontested that there—that Ms. Park suffered absolutely no injuries as a result of being hog tied. There is no funding by the district court that she suffered an injury. There is no allegation from Mrs. Parks that she suffered an injury. And there's nothing in her deposition whereby she states, I had psychological problems. I even had a minor problem as a result of that. What's all this about a five-minute video that shows her banging her face on the ground? There is a five-minute video. It was taken by a constable, and she's on the ground afterwards. She's singing songs. She never once says, I can't breathe. And if the plaintiff believed that that supported her claim or supported her opposition to the defendant's qualified immunity, then that should have been made part of the record. Is it not part of the record? It is not right now. It is not part of the summary judgment record. There were also— Let me ask you about your broad statements about injury. I think you are limiting that to your response to the hog tie issue. What do you say to Mr. Guy's point a little while ago that it's undisputed that she had certain facial injuries and was four days in the hospital at UMMC or wherever she went? Is it agreed by the parties and just somehow was not seen as critical to what was being decided so far that she was injured out there with the kinds of injuries Mr. Guy talks about? From my reading of the record, she had a hairline fracture of her orbital socket. She did have a broken nose. She has gone back in. To that extent, it's undisputed that those sorts of injuries occurred from these events? Those two, correct. She was in the hospital for four days according to the defendant's expert because of having to get her medically stable from all of the drugs that she had been using. That would have been the only reason because no one's going to keep an individual at UMMC or UMMC or otherwise who only has a hairline fracture of an orbital socket and a broken nose. The four days may not be as significant then, but she did have those particular injuries? She did. The issue then becomes when did those occur? Did Judge Jordan clearly draw the line at handcuffing and do you think that is something on this record where we can say that there's no real question that after handcuffing, she continued to engage in assaultive behavior? I think what the court must look at and what Judge Jordan didn't properly focus on is what and what Judge Jordan held was that she claimed to not be combative after becoming handcuffed. The issue of I guess whether she was combative or not, whether she showed that with her outwards actions, that is what Judge Jordan held to be a fact question for the jury. What I submit to the court though is that the officers, how are the officers supposed to know that she all of a sudden gave up? She had gone through 10 minutes of fighting with them, had kicked Watford in the groin, had bitten all of the other officers such that they had to be treated at King's Daughters Hospital in Yazoo City that afternoon. That is part of the record. How are the officers then supposed to immediately go from we've got this lady who was running around the streets, has been kicking and biting and just fighting with every fiber of her being and then all of a sudden we get her handcuffed and she's compliant. I think it would be reasonable for the officers to want to get her to the ground to make sure that she is secure. I think it would also be reasonable for the officers to want to haunt her at that position so she can't stand up and run. I see my time is up. Thank you. Question with presiding judge's permission. Do you agree that your three clients all say that she never stood up and then was pushed down? That she was down the whole time until hog time? Correct. All right. Thank you. Thank you. Okay. Thank you.